IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>QUANTAVIUS FOSTER | Criminal Action No.<br><br>1:19-CR-308-AT-RGV |

**Government Response to Defense Motion to Suppress Evidence**

The United States of America, by Ryan K. Buchanan, United States Attorney, and Nicholas N. Joy, Assistant United States Attorney for the Northern District of Georgia, files this Response to the Defense Motion to Suppress Evidence.

**1. Facts**

Starting on August 21, 2018, while intercepting voice and text messages on co-defendant Berenice Corea-Uriostegui's cellphone via court-authorized federal wiretap, DEA HIDTA agents learned that the Defendant, Quantavius Foster, would be involved in a potential drug transaction with Corea-Uriostegui. (Doc. 425, 7-8). Based on intercepted communications, agents expected that the transaction would be for methamphetamine that would be brought into Jenkins Correctional Facility. (Doc. 425, 15). Agents had identified the Defendant in part through reference to his work as a counselor; a phone number that he had used to communicate with Corea-Uriostegui, which was the same number the Defendant had provided the correctional facility as his own number; and his

1

reference to himself as "Q," which was consistent with the Defendant's first name, "Quantavius." (Doc. 425, 15-16). According to the communications, the Defendant would be paid $2,000 for his participation. (Doc. 425, 18). The communications used coded language to refer to narcotics, which is common practice for drug traffickers. (Doc. 425, 18). Agents had previously been involved in multiple enforcement actions that resulted in the seizure of drugs from Corea-Uriostegui and co-defendant Jesus Garcia-Gutierez during the course of their investigation. (Doc. 425, 18-19).

On August 30, 2018, the date that agents expected the transaction to take place based on the intercepted communications, agents set up surveillance in the parking lot of the Walmart at Deans Bridge Road in Augusta, Georgia at approximately 12:15 p.m. (Doc. 425, 8). Along with DEA HIDTA agents, Richmond County Sheriff's Office narcotics investigators also participated in the surveillance. (Doc. 425, 8). There were approximately three or four Richmond County investigators present. (Doc. 425, 14). Richmond County law enforcement was present because, prior to the intended transaction, Task Force Officer Jonathan Gray had contacted the Richmond County Sheriff's Office's Narcotics Unit for assistance. (Doc. 425, 14).

Throughout the surveillance, agents communicated with each other continuously via the push-to-talk function on their agency-provided cellphones and a WhatsApp group chat. (Doc. 425, 17). Agents received continuous updates from the wire room through the same means. (Doc. 425, 17). Task Force Officer

Jonathan Gray, one of the agents present on surveillance, was in communication with Richmond County Sheriff's Office units through the use of a Richmond County radio that he had been provided for that operation. (Doc. 425, 18). These communications included information regarding what the agents witnessed during the course of surveillance. (Doc. 425, 42).

While on surveillance, DEA agents received additional intercepted communications from the wire room that the meeting location was being changed to a strip mall with a Harvey's supermarket at 1631 Gordon Highway in Augusta, Georgia. (Doc. 425, 8-9). Agents then set up surveillance in that location. (Doc. 425, 9). Richmond County Sheriff's Office investigators participated in this surveillance as well. (Doc. 425, 14).

While on surveillance, agents saw Corea-Uriostegui arrive in a silver Toyota Corolla. (Doc. 425, 10). Agents had previously seen Corea-Uriostegui use this same vehicle during prior surveillance over the course of their investigation. (Doc. 425, 10). This silver Toyota Corolla was also consistent with a message Corea-Uriostegui had sent to the Defendant describing the vehicle in which she would be arriving. (Doc. 425, 10). The silver Corolla parked in front of the Harvey's supermarket. (Doc. 425, 10). Agents then received information from the wire room that Corea-Uriostegui had communicated to the Defendant that she was parked in front of the Harvey's. (Doc. 425, 10).

About 15 to 20 minutes later, the Defendant arrived driving a BMW. (Doc. 425, 10). The Defendant parked in the parking spot adjacent to Corea-

Uriostegui's Toyota Corolla. (Doc. 425, 12). The Defendant and Corea-Uriostegui got out, walked to the back of their cars, and opened their respective trunks. (Doc. 425, 13). Corea-Uriostegui retrieved an object from her trunk and handed it to the Defendant. (Doc. 425, 13, 45). The Defendant put the item in the trunk of his own car. (Doc. 425, 13). They then closed their respective trunks, returned to their vehicles, and drove off separately. (Doc. 425, 13). The entire transaction took approximately 30 seconds to a minute. (Doc. 425, 13). Agents were able to take several photographs of the transaction. (*See* Gov. Ex. 1).

Based on intercepted communications, agents expected Corea-Uriostegui to return to the Atlanta area to go to work, so they did not follow her. (Doc. 425, 14). The Defendant left the parking lot in the direction of Jenkins Correctional Facility. (Doc. 425, 14). Once Task Force Officer Gray had witnessed the transaction and saw the Defendant leave the parking lot, he informed Richmond County Sheriff's Office investigators that agents would be following the Defendant for five to fifteen minutes. (Doc. 425, 16). Once they had gone a little distance from the site of the transaction, Task Force Officer Gray requested that the Richmond County Sheriff's Office investigator he was communicating with coordinate a patrol unit to conduct a traffic stop on the Defendant. (Doc. 425, 16, 27). Task Force Officer Gray also asked the deputies to develop independent probable cause. (Doc. 425, 16). This was so as to further strengthen the case and preserve the possibility of bringing state charges against the Defendant without needing to disclose the wiretap. (Doc. 425, 17).

Billy Jones, at the time a supervisor in the Crime Suppression Team of the Richmond County Sheriff's Office, was notified by a narcotics investigator that there was a vehicle traveling south on Highway 25 that was possibly carrying narcotics. (Doc. 425, 55). Jones was also provided with a license plate number. (Doc. 425, 71). Jones ultimately saw the vehicle in question, a gray BMW, and stopped it for traveling too closely to a tractor trailer. (Doc. 425, 56). Jones pulled the gray BMW over in a BP gas station at 3671 Peach Orchard Road. (Doc. 425, 56). Jones's body camera recorded the stop. (Doc. 425, 56; *see* Gov. Ex. 2).

When Jones approached the Defendant, who was the driver of the BMW, and requested his driver's license, the Defendant immediately rolled up the window after providing it. (Doc. 425, 58). When Jones asked the Defendant to come to Jones's vehicle, the Defendant immediately went to open the trunk of the BMW. (Doc. 425, 59). Jones believed this was "out of the ordinary." (Doc. 425, 59). Jones began writing a warning for the Defendant at approximately two minutes and 19 seconds. (Doc. 425, 59). While Jones was writing a warning, the Defendant was looking around nervously. (Doc. 425, 60). A couple minutes later, the Defendant started singing out loud. (Doc. 425, 61).

Approximately 8 minutes and 36 seconds into the encounter, Jones asked the Defendant for consent to search his vehicle. (Doc. 425, 62). The Defendant declined to provide consent. (Doc. 425, 62). At that point, Jones requested a K-9. (Doc. 425, 62).

At approximately 9 minutes and 32 seconds, Jones was still writing the warning. (Doc. 425, 63). Three seconds later, Corporal Robert Flanders pulled up to the scene. (Doc. 425, 63). Corporal Flanders performed dog sniff on the Defendant's BMW with his K-9, Lucky. (Doc. 425, 93). As they worked around the vehicle, Lucky caught an odor on the right side of the trunk. (Doc. 425, 94). Lucky gave a final indication that he had found one of the odors he was trained to seek by sitting down. (Doc. 425, 94-95). At the time of this traffic stop, Corporal Flanders had received Richmond County's standard training for a K-9 operator, was certified, and had participated in approximately 60 traffic stops with his K-9, Lucky, prior to that point. (Doc. 425, 90-91). Lucky had also been trained and was certified. (Doc. 425, 91). Lucky was trained to detect the odor of various narcotics including methamphetamine. (Doc. 425, 95).

After the positive alert, officers searched the Defendant's BMW. Jones found U.S. currency in the glove compartment. (Doc. 425, 64). In the trunk, Jones found two cylinders wrapped in electrical tape among Mary Kay cosmetics. (Doc. 425, 65). Inside the cylinders were white crystals that were consistent with methamphetamine. (Doc. 425, 65).

On September 29, 2021, the Defendant filed a motion to suppress evidence "illegally obtained by the state." On October 29, 2021, the Defendant filed an amended version of this motion to suppress.

2. Argument

   a. **Richmond County Officers had Probable Cause to Stop and Search the Defendant's Vehicle Through Collective Knowledge**

Officers had probable cause to search the vehicle because of the information they had received from the DEA agents who had intercepted communications setting up a drug transaction between the Defendant and Corea-Uriostegui and who had surveilled the Defendant during this transaction. Due to the "automobile exception," officers were authorized to search the vehicle without obtaining a warrant.

"Collective knowledge" doctrine, through which the knowledge of one officer is imputed to another, allows a court to impute the requisite probable cause or reasonable suspicion from an officer who has it to a different officer who conducts the search of a vehicle. *See, e.g. United States v. Hensley*, 469 U.S. 221, 233 (1985)("Assuming the police make a Terry stop in objective reliance on a flyer or bulletin, we hold that the evidence uncovered in the course of the stop is admissible if the police who issued the flyer or bulletin possessed a reasonable suspicion justifying a stop."); *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985)( "Probable cause . . . exists where the facts and circumstances within the collective knowledge of law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed.").

A court may consider the collective knowledge of officers "if they maintained at least a minimal level of communication during their

investigation." *Willis*, 759 F.2d at 1494. The fact that an arresting officer may not have known all of the facts already uncovered in the investigation does not render an arrest unlawful. *United States v. Kapperman*, 764 F.2d 786, 791 n.5 (11th Cir. 1985).

In this case, DEA agents had intercepted communications between the Defendant and Corea-Uriostegui setting up a drug transaction in Augusta, Georgia on August 30, 2018. Through these communications, agents had identified the Defendant prior to the transaction. They knew that he was a counselor at Jenkins Correctional Facility and would be paid $2,000 for the transaction. They also knew that the drugs would be brought into the correctional facility. Shortly before the meeting, the location of the transaction was changed from the parking lot of the Walmart at Deans Bridge Road to the parking lot of the Harvey's supermarket.

Consistent with the calls and texts, Corea-Uriostegui arrived in the Harvey's parking lot in her silver Toyota Corolla, the same vehicle she had told the Defendant she would be driving. A little while later, the Defendant pulled up next to Corea-Uriostegui's Corolla. Each individual opened the trunk of their vehicle, and agents witnessed Corea-Uriostegui pass an item to the Defendant that he put into the trunk of his BMW. The whole transaction was very quick – only 30 seconds to a minute long. At that point, Corea-Uriostegui and the Defendant went on their ways. The Defendant began driving back in the direction of Jenkins Correctional Facility.

Taken all together, this information was sufficient to cause a person of reasonable caution to believe that a drug transaction was being committed. *Willis*, 759 F.2d at 1494. Thus, there was probable cause.

Because the DEA agents maintained "at least a minimal level of communication during their investigation," their collective knowledge can be imputed to the Richmond County officers. *Willis*, 759 F.2d at 1494. Task Force Officer Gray, one of the agents present, was in communication with Richmond County Sheriff's Office investigators via radio during the course of surveillance. Additionally, Richmond County investigators were themselves present at the location of the transaction. When the Defendant began to return to the correctional facility after the transaction, Task Force Officer Gray told his Richmond County contacts to conduct a traffic stop. Jones, the officer who performed the traffic stop, had received information from the Richmond County narcotics investigators regarding the Defendant's license plate number and the fact that the Defendant may have narcotics in his car. This chain of communication is sufficient to allow the agents' probable cause to be imputed to Jones.[1]

---

[1] The Defendant's argument that Jones abandoned collective knowledge that there were potentially drugs in the BMW when he sought to develop probable cause independent of this knowledge is unavailing. The facts that Jones and the other law enforcement officers he was in contact with knew are what matters for the analysis, not Jones's mental state or his own determination about whether he had reasonable suspicion or probable cause. *See Devenpeck v. Alford*, 543 U.S. 146,

The "automobile exception" allows law enforcement officers to "conduct a warrantless search of a vehicle if: (1) the vehicle is readily mobile (i.e., operational); and (2) officers have probable cause to believe the vehicle contains contraband or evidence of a crime." *United States v. Adigun*, 567 F. App'x 708, 712 (11th Cir. 2014) (quoting *United States v. Tamari*, 454 F.3d 1259, 1261 (11th Cir. 2006). The Fourth Amendment does not require exigent circumstances beyond the fact that a vehicle is functional and readily mobile. *See, e.g., United States v. Watts*, 329 F.3d 1282, 1286 (11th Cir. 2003).

In this case, the vehicle was functional and readily mobile, as it had been driving when the Richmond County officers stopped it. Based on the collective knowledge of the agents and officers, there was probable cause to believe the vehicle contained contraband – specifically, methamphetamine. Thus, officers were permitted to search the vehicle without a search warrant.

> **b. Even if Information Within the Collective Knowledge of the Agents Were Insufficient for Probable Cause, Richmond County Officers Obtained Sufficient Additional Information to Search the BMW in the Course of the Traffic Stop**

Even if, *arguendo*, the information in the collective knowledge of the DEA agents in contact with the Richmond County officers did not reach the level of probable cause when the traffic stop was initiated, the officers obtained enough

---

153 (2004) ("[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause.").

additional information through their own investigative steps to provide probable cause to search the Defendant's gray BMW.

Regardless of whether there is probable cause, the police may stop a car and briefly detain it and its occupants in order to investigate a reasonable suspicion that such persons are involved in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *United States v. Tapia*, 912 F.2d 1367, 1370 (11th Cir. 1990); *United States v. Mikell*, 102 F.3d 470, 474 (11th Cir. 1996). "Reasonable suspicion" is determined from the totality of the circumstances. *United States v. Sokolow*, 490 U.S. 1, 8 (1989). The level of suspicion required is "obviously less demanding than that for probable cause." *Id.* at 7. To lawfully conduct a traffic stop, a police officer need only "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21; *Tapia*, 912 F.2d at 1370.

The constitutional reasonableness of a traffic stop does not depend on the actual motivations of the individual officers involved. *Whren v. United States*, 517 U.S. 806, 813 (1996). It does not matter if an officer has an ulterior motive when stopping a car or uses a stop as a "pretext" because the "constitutional 'reasonableness' of a traffic stop must be determined irrespective of 'intent.'" *United States v. Holloman*, 113 F.3d 192, 194 (11th Cir. 1997).

There is no question that the information within the collective knowledge of the DEA agents and the Richmond County officers when Task Force Officer Gray requested that the Defendant's BMW be stopped met the standard of reasonable

suspicion to perform a traffic stop. As discussed above, DEA agents knew that Corea-Uriostegui and the Defendant had set up a methamphetamine transaction and that they had behaved in a manner consistent with completing this transaction in the Harvey's parking lot. Additionally, Jones observed the Defendant following a tractor trailer too closely.

 Once the BMW was stopped, Jones obtained additional evidence from his interaction with the Defendant. The Defendant instinctively began to open the trunk of his vehicle without being asked, which is unusual behavior that begs the question of what the Defendant knew was in the trunk. The Defendant also was constantly looking around and engaged in bizarre behavior such as spontaneously breaking into song. While nervousness by itself does not rise to the level of reasonable suspicion, it is relevant. *See United States v. Hernandez*, 418 F.3d 1206, 1211 (11th Cir. 2005). For the Defendant to be so uncommonly agitated was particularly strange given that the Defendant was a former correctional officer and was only receiving a warning.

 An officer may prolong a traffic stop for a reasonable amount of time beyond that which is necessary to process a traffic violation if there is reasonable and articulable suspicion of other illegal activity. *United States v. Boyce*, 351 F.3d 1102, 1106 (11th Cir. 2003). Taken together with the information provided by the DEA agents regarding the suspected drug transaction, the Richmond County officers would have been justified in prolonging the traffic stop to perform a K-9 inspection to determine if there were drugs in the BMW.

 However, even if sufficient reasonable and articulable suspicion to prolong the stop had not existed, the stop itself was not unnecessarily prolonged despite the use of the K-9. "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). Jones was still writing a warning for the Defendant when Corporal Flanders arrived with K-9 Lucky, and this was only approximately seven minutes after Jones began writing the warning. This was a reasonable time necessary to complete a stop to provide a warning. *See, e.g.*, *United States v. Purcell*, 236 F.3d 1274, 1279 (11th Cir. 2001) ("Fourteen minutes is not an unreasonable amount of time for a traffic stop.").

 Probable cause arises when a drug-trained canine alerts to drugs. *United States v. Dunkley*, 911 F.2d 522 (11th Cir. 1990); *United States v. Tamari*, 454 F.3d 1259, 1265 (11th Cir. 2006). In this case, K-9 Lucky alerted to the odor of narcotics within the gray BMW driven by the Defendant. Both Corporal Flanders and K-9 Lucky were certified and trained at the time of the traffic stop in this case. Because K-9 Lucky alerted to the odor of narcotics, there was probable cause to search the vehicle.

 \
 \
 \
 \

### 3. Conclusion

Because the traffic stop and search of the gray BMW occupied by the Defendant was lawful, the Government respectfully requests that the Court deny the Defense Motion to Suppress.

                Respectfully submitted,

                RYAN K. BUCHANAN
                  *United States Attorney*

                /s/NICHOLAS N. JOY
                  *Assistant United States Attorney*
                Georgia Bar No. 969557
                Nicholas.joy@usdoj.gov

**Certificate of Service**

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

> Alexander J. Repasky
> Law Office of Alexander J. Repasky
> Suite 165
> 4880 Lower Roswell Road
> Marietta, GA 30068

June 8, 2022

/s/ NICHOLAS N. JOY

NICHOLAS N. JOY

*Assistant United States Attorney*