**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**


UNITED STATES OF AMERICA          :
                                  :
                                  :          CRIMINAL CASE NO.
v.                                :          1:19-cr-00308-AT-RGV
                                  :
                                  :
QUANTAVIUS FOSTER                 :
AMADEO GAMA-AGUIRRE


### MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER

Defendants Quantavius Foster ("Foster") and Amadeo Gama-Aguirre ("Gama-Aguirre") are named along with fifteen other co-defendants in a thirteen-count indictment that charges conspiracy to distribute a controlled substance, in violation of 21 U.S.C. § 846; possession with intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(A), (C) and 18 U.S.C. § 2; and distributing a controlled substance near a school, in violation of 21 U.S.C. § 860.  [Doc. 1].[1]  Gama-Aguirre has filed a motion to suppress statements, [Doc.

---

[1] The indictment also contains a forfeiture provision pursuant to 21 U.S.C. § 853 and 28 U.S.C. § 2461(c).  [Doc. 1 at 16-18].  The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

344], which he supplemented, [Doc. 348].  Foster has filed a motion to suppress evidence, [Doc. 372], which he perfected, [Doc. 381].  An evidentiary hearing was held with respect to Gama-Aguirre's motion to suppress on February 8, 2022, <u>see</u> [Doc. 406], and on March 10, 2022, an evidentiary hearing was held regarding Foster's motion to suppress, <u>see</u> [Doc. 414].[2]  Following the evidentiary hearings, the parties filed post-hearing briefs, <u>see</u> [Docs. 417, 419, 430, 436, & 437], and for the reasons that follow, it is **RECOMMENDED** that Gama-Aguirre's motion to suppress statements, [Doc. 344], as supplemented, [Doc. 348], and Foster's motion to suppress evidence, [Doc. 372], as perfected, [Doc. 381], be **DENIED**.

A.   <u>**Foster's Motion to Suppress, [Docs. 372 & 381]**</u>

Foster moves to suppress the evidence obtained from the search of his vehicle on August 30, 2018, [Docs. 372 & 381], contending that "all actions, from the initial stop to the unlawful coercive action of the Officer following the completion of the stop, including, but not limited to [his ] detainment, subsequent

---

[2] <u>See</u> [Doc. 412] for a transcript of the February 8, 2022, evidentiary hearing, and [Doc. 425] for a transcript of the March 10, 2022, evidentiary hearing.  Citations to the February 8, 2022, evidentiary hearing transcript hereinafter will be referred to as "(Tr. 1 at ___)," and citations to the March 10, 2022, evidentiary hearing will be referred to as "(Tr. 2 at ___)."  In addition, the government submitted exhibits at the evidentiary hearings, which will be referred to as "(G-Gov. Ex. __)" for the February 8, 2022, evidentiary hearing and "(F-Gov. Ex. __)" for the March 10, 2022, evidentiary hearing.

questioning, and the search of his vehicle, were unlawful and in violation of [his] constitutional rights," [Doc. 381 at 11].  Following the evidentiary hearing on his perfected motion, Foster filed a supplemental brief, [Doc. 430], to which the government responded, [Doc. 436], and Foster filed a reply, [Doc. 437].  For the reasons that follow, it is **RECOMMENDED** that Foster's motion to suppress evidence, [Doc. 372], as perfected, [Doc. 381], be **DENIED**.

## 1.   *Statement of Facts*

On or about August 21, 2018, agents of the Drug Enforcement Administration ("DEA") High Intensity Drug Trafficking Areas ("HIDTA"), who were intercepting voice and text messages on co-defendant Berenice Corea-Uriostegui's ("Corea") cellphone via a court-authorized federal wiretap in an investigation of a prison-based drug broker, learned that Corea was planning a potential drug transaction with an individual, later identified as defendant Foster, who was supposed to take methamphetamine into Jenkins Correctional Facility, where Foster was employed as a counselor.  (Tr. 2 at 8-9, 16-17).  Based on intercepted communications, agents expected the transaction to take place on August 30, 2018, in the parking lot of the Walmart at Deans Bridge Road in Augusta, Georgia, and DEA HIDTA Task Force Officer Jonathan Gray ("TFO Gray") and other DEA HIDTA agents, as well as Richmond County Sheriff's Office

narcotics investigators, established surveillance at that location at approximately 12:15 p.m.  (Tr. 2 at 9, 45).  During the surveillance that day, agents communicated with each other via the push-to-talk function on their agency-provided cellphones and a WhatsApp group chat and received updates from the wire room through the same means.  (Tr. 2 at 18).  Also, TFO Gray was in communication with Richmond County Sheriff's Office units through a Richmond County radio that he had been provided to him for the surveillance operation, (Tr. 2 at 19), and these communications included relaying information from the wire room where communications between Corea and Foster were being intercepted and regarding what the agents witnessed during the surveillance, (Tr. 2 at 43).

While on surveillance, DEA HIDTA agents received additional information from the wire room based on intercepted communications that the meeting location was being changed to a strip mall at 1631 Gordon Highway in Augusta, Georgia, where a Harveys supermarket was located.  (Tr. 2 at 9-10, 45-46).  DEA HIDTA agents then set up surveillance in that location, (Tr. 2 at 10, 46), and Richmond County Sheriff's Office investigators participated in this surveillance as well, (Tr. 2 at 15).  While on surveillance, agents saw Corea arrive at the Harveys supermarket parking lot in a silver Toyota Corolla, (Tr. 2 at 11-13, 47; F-Gov. Ex. 1), a vehicle that agents had seen Corea use during prior surveillance over the

course of their investigation, (Tr. 2 at 11). The Corolla was consistent with the description of the vehicle Corea sent in a message to Foster describing what she would be driving when they met. (Id.).

After the Corolla parked in the Harveys supermarket parking lot, DEA HIDTA agents received information from the wire room that Corea had communicated to Foster that she was parked in front of the Harveys supermarket. (Id.). Approximately 15 to 20 minutes later, Foster arrived at the Harveys supermarket parking lot driving a BMW and parked in the spot adjacent to Corea's Corolla. (Tr. 2 at 11, 13). Corea and Foster exited their vehicles and walked to the rear of each and opened their respective trunks. (Tr. 2 at 14, 20-21, 46). Agents conducting surveillance observed Corea retrieve an object from her trunk and hand it to Foster, who put the item in the trunk of his BMW. (Tr. 2 at 14, 20, 46). Corea and Foster then closed their respective trunks, returned to their vehicles, and drove off separately. (Tr. 2 at 14, 20). The entire transaction took approximately 30 seconds to a minute, and Foster departed the parking lot, driving in the direction of Jenkins Correctional Facility. (Tr. 2 at 14-15).

After TFO Gray observed Foster leave the parking lot, he informed Richmond County Sheriff's Office investigators that agents would be following the BMW for 5 to 15 minutes, and once they had traveled a little distance from the

5

site of the transaction, he requested that the Richmond County Sheriff's Office investigator with whom he was communicating coordinate with a uniformed patrol officer to conduct a traffic stop of Foster's vehicle. (Tr. 2 at 17, 29). TFO Gray requested that the patrol officer attempt to develop independent probable cause for a traffic stop in order to strengthen the case and preserve the possibility of bringing state charges against Foster and to protect the integrity of the ongoing wiretap investigation. (Tr. 2 at 17-18, 28-29).

Corporal Billy Jones ("Corporal Jones"), who was a supervisor on the Crime Suppression Team of the Richmond County Sheriff's Office at the time,[3] was on patrol when notified by a narcotics investigator that there was a vehicle traveling south on Highway 25 that was possibly carrying narcotics. (Tr. 2 at 56). Corporal Jones was provided the license plate number and a description of the BMW Foster was driving, (Tr. 2 at 56-57, 72-74), and he ultimately saw the vehicle and stopped it for traveling too closely to a tractor trailer in front of the BMW, (Tr. 2 at 57). After Corporal Jones activated his lights, Foster stopped and parked his vehicle at a BP gas station at 3671 Peach Orchard Road, Augusta, Georgia. (Tr. 2 at 57, 73).

---

[3] Corporal Jones was no longer employed by the Richmond County Sheriff's Office at the time of the evidentiary hearing as he had resigned after more than 20 years of service. (Tr. 2 at 56, 87).

6

Corporal Jones' body camera recorded the stop.  (Tr. 2 at 57); <u>see also</u> (F-Gov. Ex. 2).

Corporal Jones approached the BMW on the passenger side, and Foster, who was the sole occupant of the vehicle, lowered the front passenger window, and handed his driver's license to Corporal Jones and proceeded to raise the passenger window as Corporal Jones was about to ask him a question.  (Tr. 2 at 59; F-Gov. Ex. 2 at 00:20–00:28).  Corporal Jones asked, "What was that?," and Foster lowered the window again and said, "Oh, my bad."  (F-Gov. Ex. 2 at 00:29-00:33).  Corporal Jones had a brief conversation with Foster about selling Mary Kay cosmetics, as he had noticed a Mary Kay sticker on the rear windshield of the BMW, (Tr. 2 at 60-61, 76; F-Gov. Ex. 2 at 00:33-00:50), and he then asked him to step out of the vehicle to explain to Foster why he had stopped him, (F-Gov. Ex. 2 at 00:57-1:00).  Foster exited his vehicle and walked to the rear of the BMW and began to open the trunk.  (Tr. 2 at 59-60; F-Gov. Ex. 2 at 01:00-01:11).  Corporal Jones stopped him from opening the trunk and believed this conduct was "out of the ordinary."  (Tr. 2 at 60).  Corporal Jones asked Foster why he was opening the trunk, and Foster said, "I thought you wanted to look in it."  (F-Gov. Ex. 2 at 01:12-01:20).

Corporal Jones then told Foster that he had stopped him for following too closely to a tractor trailer and explained the danger of doing so and informed Foster that he was going to issue him a warning instead of writing him a ticket. (Tr. 2 at 60, 70; F-Gov. Ex. 2 at 01:20-02:10).   Corporal Jones began writing the warning citation approximately 2 minutes and 20 seconds after initiating contact with Foster on the stop.  (Tr. 2 at 60; F-Gov. Ex. 2 at 02:19).  While Corporal Jones was writing the warning, he carried on a conversation with Foster about his work as a counselor at Jenkins Correctional Facility.  (F-Gov. Ex. 2 at 02:58-04:12).  While conversing with Corporal Jones, Foster was looking around in a way that Corporal Jones believed indicated that he was nervous.  (Tr. 2 at 61-63; F-Gov. Ex. 2 at 02:55-4:10).   Corporal Jones asked Foster if he was expecting anyone since he kept looking around, and Foster said no and that he was just headed home to a sick child who had kept him up the night before.  (F-Gov. Ex. 2 at 04:10-04:28).   As Corporal Jones continued to write the warning, Foster kept turning and looking around, (F-Gov. Ex. 2 at 04:28-06:10), and a couple of minutes later, he started singing aloud, (Tr. 2 at 62; F-Gov. Ex. 2 at 06:10).  Corporal Jones asked Foster if he was okay and commented that he appeared to be nervous.  (F-Gov. Ex. 2 at 06:22-06:28).  Foster said he was fine and had not done anything, but commented that Corporal Jones kept asking him questions and was taking a long time to write the

8

warning. (F-Gov. Ex. 2 at 06:28-06:52). Corporal Jones apologized for not writing faster but said he had been writing the whole time they conversed, and he continued writing the warning, (F-Gov. Ex. 2 at 06:58-07:55), and as he waited, Foster began singing aloud again, (F-Gov. Ex. 2 at 07:17-07:52).

Approximately eight minutes after initiating the stop, Corporal Jones asked Foster if there was anything illegal inside his vehicle, and Foster responded, "Why are you asking me that?" to which Corporal Jones replied, "Because you are more nervous than the average person would be getting a warning." (F-Gov. Ex. 2 at 08:01-08:12). Foster denied that he was nervous, and Corporal Jones asked him again if there was anything illegal inside his vehicle, and Foster said, "No." (F-Gov. Ex. 2 at 08:15-08:22). Corporal Jones then asked him for permission to search his vehicle, but Foster declined. (Tr. 2 at 63, 78-79; F-Gov. Ex. 2 at 08:23-08:29). Corporal Jones immediately requested a K-9 unit, and approximately one minute later, Corporal Robert Flanders ("Corporal Flanders") and his K-9, Lucky, arrived on the scene of the traffic stop as Corporal Jones continued writing the warning citation. (Tr. 2 at 63-64; F-Gov. Ex. 2 at 08:30-09:32). Corporal Flanders walked Lucky around Foster's BMW, and Lucky alerted to an odor of narcotics on the right side of the trunk. (Tr. 2 at 64; F-Gov. Ex. 2 at 10:34-10:55). After the positive alert, Corporal Jones completed writing the warning citation and then searched the

BMW and found U.S. currency in the glove compartment and two cylinders wrapped in electrical tape in the trunk among Mary Kay cosmetics.  (Tr. 2 at 65-66, 80; F-Gov. Ex. 2 at 11:50-21:10).  Inside the cylinders, Corporal Jones found white crystals that were consistent with methamphetamine, and Foster was placed in handcuffs.  (Tr. 2 at 66-67; F-Gov. Ex. 2 at 21:11-21:40).

    **2.** *Discussion*

Foster argues that the stop of his "vehicle was not a stop based upon a violation of law" because Corporal Jones "determined beforehand that an instructional warning would be given" for "following too closely[.]"  [Doc. 430 at 21].  Foster contends that the government cannot rely on the collective knowledge doctrine to supply probable cause for the stop and search of his vehicle because both TFO Gray and Corporal Jones testified that "there was no connection whatsoever in the decision-making process of the arresting officer who made the traffic stop and state and federal officers involved in the investigation."  [Id. at 2].  Instead, Foster asserts that the only probable cause developed by Corporal Jones to search the vehicle was based on Foster's nervousness, which alone is insufficient to provide probable cause for the search of his vehicle.  [Id. at 13-14, 16-17].  Foster further argues that he was detained for an unreasonable period of time as there

was "no probable cause to detain [him ] or search his vehicle based upon a mere suspicion or hunch."  [Id. at 18].

The government responds that Corporal Jones had probable cause to stop and search Foster's vehicle based on the collective knowledge doctrine, since the DEA HIDTA agents maintained communication with the Richmond County Sheriff's Department narcotics investigators during the surveillance of Corea's meeting with Foster at the Harveys supermarket parking lot, where agents suspected a drug transaction had occurred, and information about the investigation was relayed to Corporal Jones, who was provided a description of Foster's BMW and its license plate number and told that the vehicle may have narcotics inside.  [Doc. 436 at 7-9].  And, the government asserts that even if the information in the collective knowledge of the law enforcement agents did not establish probable cause, Corporal Jones lawfully stopped Foster for following too closely to the tractor trailer in front of his vehicle and developed additional information during the traffic stop that supplied reasonable suspicion to prolong the stop for further investigation, and the K-9 alert on the BMW provided probable cause to search the vehicle.  [Id. at 10-13].

In his reply, Foster argues that "according to the testimony in this matter before the Court, at the time of the stop, the investigation and the officers involved

11

had not yet reached a point where they could determine that, from their investigation, they had developed that there was probable cause to stop the vehicle, absent the probable cause developed by the officer making the traffic stop." [Doc. 437 at 6 (emphasis omitted)]. And, he reiterates that the collective knowledge doctrine does not apply in this case as he claims that Corporal Jones testified that "he completely ignored any communication regarding [ Foster] in developing probable cause to stop, detain, and to search the vehicle," [id. at 13], and he disputes that Corporal Jones lawfully stopped him for following too closely, claiming that Corporal Jones "essentially testified that what the individual in the vehicle was doing did not rise to the level of a violation of that traffic ordinance," [id. at 10]. Foster also asserts that the only reason Corporal Jones "wanted to search the vehicle[] was the nervousness of the [ driver]," [id. at 11], which was insufficient to prolong the stop or supply probable cause, and he urges the Court to "find that [the] lengthy engagement is simply not constitutionally permissible as a matter of law," [id. at 6].

### a.    Probable Cause to Initiate the Traffic Stop

"The Fourth Amendment protects individuals from unreasonable search and seizure." United States v. Rowls, 402 F. App'x 467, 468 (11th Cir. 2010) (per curiam) (unpublished) (citation and internal marks omitted). The "[t]emporary

detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." Whren v. United States, 517 U.S. 806, 809-10 (1996) (citations omitted); see also United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001); United States v. Edenilson-Reyes, Criminal Action File No. 1:09–CR–00361–RWS–AJB, 2010 WL 5620439, at *9 (N.D. Ga. Oct. 26, 2010), adopted by 2011 WL 195679, at *1 (N.D. Ga. Jan. 20, 2011).

A traffic stop is reasonable if the officer had probable cause to believe that a traffic violation has occurred or the stop is justified by reasonable suspicion in compliance with Terry v. Ohio, 392 U.S. 1 (1968). Edenilson-Reyes, 2010 WL 5620439, at *9 (citing United States v. Spoerke, 568 F.3d 1236, 1248 (11th Cir. 2009); Purcell, 236 F.3d at 1277); see also United States v. Monzon-Gomez, 244 F. App'x 954, 959 (11th Cir. 2007) (per curiam) (unpublished); United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999); United States v. Sierra, Cr. No. 2:10cr183–MEF, 2011 WL 1675217, at *2 (M.D. Ala. Apr. 19, 2011), adopted by 2011 WL 1675180, at *1 (M.D. Ala. May 4, 2011), aff'd by 501 F. App'x 900 (11th Cir. 2012) (per curiam) (unpublished). Thus, "[a] traffic stop . . . is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable

suspicion. . . ."[4] Edenilson-Reyes, 2010 WL 5620439, at *9 (alterations in original) (citations and internal marks omitted); see also United States v. Boyd, 388 F. App'x 943, 947 (11th Cir. 2010) (per curiam) (unpublished); United States v. Woods, 385 F. App'x 914, 915 (11th Cir. 2010) (per curiam) (unpublished). The government bears the burden of presenting facts to establish that the traffic stop is supported by reasonable suspicion or probable cause. See Welsh v. Wisconsin, 466 U.S. 740, 749-50 (1984); see also United States v. Kelly, No. 1:13–cr–108–WSD–JSA, 2014 WL 1153375, at *8 (N.D. Ga. Mar. 21, 2014) (citations omitted), adopted at *4.

An officer's subjective intentions and motives are irrelevant where the officer has probable cause for the stop. See United States v. Mwangi, Criminal File No. 1:09-CR-107-TWT, 2010 WL 520793, at *3 n.9 (N.D. Ga. Feb. 5, 2010) (citations omitted), adopted at *1; see also United States v. Arango, 396 F. App'x 631, 632-33 (11th Cir. 2010) (per curiam) (unpublished) (citation and internal marks omitted) ("Where objectively reasonable conditions permit a stop, the officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable

---

[4] Probable cause must be supported by more than a mere suspicion, but does not require the same "'standard of conclusiveness and probability as the facts necessary to support a conviction.'" United States v. Dunn, 345 F.3d 1285, 1290 (11th Cir. 2003) (quoting Wood v. Kesler, 323 F.3d 872, 878 (11th Cir. 2003)). Reasonable suspicion is a less demanding standard than probable cause and requires only a fair probability that illegal activity has occurred. United States v. Sokolow, 490 U.S. 1, 7 (1989).

behavior under the Fourth Amendment."); <u>Miller v. Harget</u>, 458 F.3d 1251, 1260 (11th Cir. 2006) (citations omitted) ("It is well-settled that an officer's subjective motivations do not affect whether probable cause existed"); <u>United States v. Jimenez</u>, No. 2:06-cr-74-FtM-29DNF, 2006 WL 2927477, at *2 (M.D. Fla. Oct. 11, 2006) (holding that "an officer's belief that he has probable cause or does not have probable cause is simply not a pertinent factor" in determining whether an arrest is lawful). That is, "if the driver of a car has broken a traffic law, no matter how relatively minor, a motion to suppress evidence cannot be based on the argument that the stop was pretextual." <u>United States v. Wright</u>, No. CR210-022, 2010 WL 4967468, at *1 (S.D. Ga. Nov. 5, 2010) (citation omitted), adopted by 2010 WL 4967838, at *1 (S.D. Ga. Dec. 1, 2010).

In addition, "[t]he propriety of the traffic stop [] does not depend on whether the defendant is actually guilty of committing a traffic offense." <u>United States v. Sicairos-Sicairos</u>, Criminal Action File No. 4:10–CR–054–HLM, 2011 WL 2710031, at *5 (N.D. Ga. July 11, 2011) (citation omitted). "Instead, the relevant question is whether it was reasonable for the officer to believe that a traffic offense had been committed." <u>Id.</u> (citation omitted). Foster has not disputed that Corporal Jones observed him following too closely behind a tractor trailer and initiated the stop of his vehicle to issue a warning. However, Foster contends that since

Corporal Jones testified that he only intended to issue him a warning rather than a ticket when he stopped him, Corporal Jones "essentially testified that what the individual in the vehicle was doing did not rise to the level of a violation of that traffic ordinance." [Doc. 437 at 10]. Foster's argument is without merit.

"An officer who observes a vehicle following another too closely has probable cause to stop the offending vehicle." United States v. Bourassa, CRIMINAL ACTION FILE NO. 4:18-CR-0003-MLB-WEJ-1, 2019 WL 7559294, at *14 (N.D. Ga. May 20, 2019) (citation omitted), adopted in part by 2019 WL 5288137, at *8 (N.D. Ga. Oct. 18, 2019). Corporal Jones clearly testified that he witnessed Foster commit a traffic offense by following too closely to the vehicle in front of him, (Tr. 2 at 57); see O.C.G.A. § 40-6-49(a) ("The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway."), and the fact that he exercised his discretion to issue Foster a warning instead of a ticket is inconsequential to the analysis of whether he lawfully stopped Foster, see United States v. Peguero, No. 4:10cr29-SPM, 2010 WL 3958422, at *3 (N.D. Fla. Oct. 7, 2010) (rejecting argument that deputy lacked probable cause to stop vehicle for speeding because he "decided only to issue a warning"), aff'd, 518 F. App'x 792 (11th Cir. 2013) (per curiam) (unpublished).

Hence, based on the uncontested testimony of Corporal Jones that he witnessed Foster commit the traffic offense of following too closely, he lawfully stopped Foster for that traffic offense, regardless of whether he intended to issue him a warning instead of a ticket.  See United States v. Randall, 211 F. Supp. 2d 1127, 1132 (D. Neb. 2001) (citation omitted) ("When the officer observes a vehicle traveling in excess of the permitted highway speed set by law, the automobile or its occupants can be lawfully stopped and the driver asked to accompany the officer to the patrol car, even if the officer is planning to issue only a warning ticket.").

### b.    Reasonable Suspicion for the Stop

Even if Corporal Jones had lacked probable cause to stop Foster for a traffic offense, "the stop of his vehicle was justified by reasonable suspicion based on information obtained through the agents' collective investigation and surveillance."  United States v. Goldenshtein, Criminal Case No. 1:10-CR-00323-TCB-RGV, 2011 WL 1321573, at *10 (N.D. Ga. Feb. 22, 2011), adopted by 2011 WL 1257147, at *1 (N.D. Ga. Apr. 1, 2011).  Where an investigative stop is performed by an officer at the direction of other officers, the Court must examine the collective knowledge of all the officers in determining whether there existed reasonable suspicion.  Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560, 568 (1971);

see also United States v. Mikell, 102 F.3d 470, 474-75 (11th Cir. 1996).  It is the government's burden to demonstrate that the officer had such a basis before initiating the stop.  See Welsh v. Wisconsin, 466 U.S. 740, 749-50 (1984); see also United States v. Agarwal, CIVIL ACTION FILE NUMBER 1:17-cr-043-TCB, 2018 WL 2181620, at *3 (N.D. Ga. May 11, 2018) (citation omitted).  As previously stated, "[p]robable cause is not required to justify an investigative stop; reasonable suspicion is sufficient."   United States v. Pineda-Zuniga, CRIMINAL CASE NUMBER: 1:16-CR-00323-2-LMM-JSA, 2017 WL 9477640, at *5 (N.D. Ga. Aug. 18, 2017) (footnote and citations omitted), adopted by 2017 WL 4074785, at *3 (N.D. Ga. Sept. 14, 2017).  "In deciding whether there is reasonable suspicion, the Court is to consider the collective knowledge of all law enforcement officers working together, to the extent they maintained at least a minimal level of communication during their investigation."  Id. (citing United States v. Willis, 759 F.2d 1486, 1494 (11th Cir. 1985)).

Foster argues that the government "submitted no evidence that the investigating officers and the officer conducting [the] traffic stop maintained even a minimal level of communication," [Doc. 437 at 9], but his argument is contrary to the testimony of TFO Gray and Corporal Jones.  Specifically, TFO Gray testified that DEA HIDTA agents and narcotics investigators from the Richmond County

Sheriff's Office jointly participated in the surveillance of the transaction between Corea and Foster at the Harveys supermarket parking lot.  (Tr. 2 at 14-15, 18-19). During the surveillance, agents communicated with each other via the push-to-talk function on their agency-provided cellphones and a WhatsApp group chat and received updates from the wire room through the same means.  (Tr. 2 at 18). Also, TFO Gray was in communication with Richmond County Sheriff's Office units through a Richmond County radio that he had been provided to him for the surveillance operation, (Tr. 2 at 19), and these communications included relaying information from the wire room as well as what the agents witnessed during the surveillance, (Tr. 2 at 42).  As Foster departed from the Harveys supermarket parking lot following the transaction with Corea, TFO Gray informed Richmond County Sheriff's Office investigators that agents would be following the BMW for 5 to 15 minutes, and once they had traveled a little distance from the site of the transaction, he requested that the Richmond County Sheriff's Office investigator with whom he was communicating coordinate with a uniformed patrol officer to conduct a traffic stop of Foster's BMW.  (Tr. 2 at 17, 27-28).  Corporal Jones testified that he was notified by one of the Richmond County Sheriff's Office narcotics investigators that there was a vehicle traveling south on Highway 25 that possibly contained narcotics, (Tr. 2 at 56), and he was provided a description of the vehicle

and its license plate number, (Tr. 2 at 56-57, 72-74).  Corporal Jones identified that

vehicle and stopped it for a traffic offense after observing it following too closely

to a tractor trailer in front of it.  (Tr. 2 at 57).  Thus, the government presented

sufficient evidence to demonstrate that there was at least minimal communication

among the federal agents and the local narcotics investigators who relayed

relevant details about the suspected drug transaction to Corporal Jones that

Foster's vehicle possibly was transporting narcotics, and the collective knowledge

of the investigating agents who conducted surveillance of the transaction between

Corea and Foster based on the interception of communications between Corea and

Foster and their communication with the Richmond County Sheriff's Department

investigators, who relayed to Corporal Jones the description and tag number of

Foster's BMW as well as their belief, based on the investigation, that narcotics were

inside the vehicle, supplied reasonable suspicion, at a minimum, to stop Foster as

he drove the BMW.  Therefore, in addition to the lawful traffic stop for following

too closely, "the stop of [the BMW] was justified by reasonable suspicion based on

information obtained through the agents' collective investigation and

surveillance."  Goldenshtein, 2011 WL 1321573, at *10.

### c.      Scope and Duration of the Traffic Stop

Foster complains about the duration of the traffic stop, arguing that it was unreasonably long and that Corporal Jones did not have probable cause to prolong the stop for investigative purposes based no his perception that Foster was nervous.  [Doc. 437 at 6].  Even though an officer may have justification to initiate a traffic stop, the ensuing detention of a vehicle's occupant must not be excessively intrusive in that the officer's actions "must be 'reasonably related in scope to the circumstances which justified the interference in the first place.'"  United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003) (quoting Terry, 392 U.S. at 20); see also United States v. Cantu, 227 F. App'x 783, 785 (11th Cir. 2007) (per curiam) (unpublished).  The stop must be of limited duration and "the stop may not last any longer than necessary to process the traffic violation unless there is articulable suspicion of other illegal activity."  United States v. Garcia, 284 F. App'x 791, 794 (11th Cir. 2008) (per curiam) (unpublished) (citation and internal marks omitted).  The duration of the traffic stop "must be limited to the time necessary to effectuate the purpose of the stop."  Purcell, 236 F.3d at 1277 (quoting United States v. Holloman, 113 F.3d 192, 196 (11th Cir. 1997) (per curiam)).

"Asking questions while in the process of writing out a citation or awaiting the response of a computer check, however, does not extend the duration or scope

of a valid initial seizure." <u>Garcia</u>, 284 F. App'x at 794 (citing <u>Purcell</u>, 236 F.3d at 1279-80); <u>see also</u> <u>United States v. Acosta</u>, 807 F. Supp. 2d 1154, 1196-97 (N.D. Ga. 2011) (footnote and citations omitted) ("The duration of a traffic stop may be prolonged to investigate, by the use of computer checks, the driver's license and the vehicle registration and, for officer's safety, the criminal history of the driver."), adopted at 1169.  In fact, "[t]he officer can lawfully ask questions, even questions not strictly related to the traffic stop, while waiting for a computer check of registration or examining a driver's license so long as it does not prolong beyond the time reasonably required to complete that mission."  <u>Cantu</u>, 227 F. App'x at 785 (alteration, citation, and internal marks omitted).[5]  "Ordinarily, when a citation or warning has been issued and all record checks have been completed and come back clean, the legitimate investigative purpose of the traffic stop is fulfilled."  <u>Edenilson-Reyes</u>, 2010 WL 5620439, at *10 (citation and internal marks omitted).

"However, a traffic stop may last longer than the purpose of the stop would ordinarily permit if an officer, based on specific facts and rational inferences

---

[5] That is, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."  <u>Arizona v. Johnson</u>, 555 U.S. 323, 333 (2009) (citation omitted).

drawn from those facts in light of his training and experience, has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring." United States v. DeJesus, 435 F. App'x 895, 900 (11th Cir. 2011) (per curiam) (unpublished) (citations omitted).  That is, "[a]n investigative stop can grow out of a traffic stop so long as the officer has reasonable suspicion of criminal activity to expand his investigation, even if his suspicions were unrelated to the traffic offense that served as the basis of the stop." United States v. Gomez Serena, 368 F.3d 1037, 1041 (8th Cir. 2004) (citation omitted).  As the Supreme Court has held, "[a] seizure justified only by a police-observed traffic violation . . . become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation," absent either reasonable suspicion or consent.  Rodriguez v. United States, 575 U.S. 348, 350-51 (2015) (all but first alteration in original) (citation and internal marks omitted).

"[I]f the initial stop was legal, the [officer] had the duty to investigate suspicious circumstances that then came to his attention." Simmons, 172 F.3d at 779 (second alteration in original) (citation and internal marks omitted).  As previously discussed, the traffic stop was lawful, and as Corporal Jones was in the process of writing Foster a warning, he noticed that Foster seemed "[o]verly nervous" for someone receiving a warning instead of a ticket, based on his

experience.  (Tr. 2 at   61-62; F-Gov. Ex. 2 at 08:01-08:12); <u>see also</u> <u>Illinois v. Wardlow</u>, 528 U.S. 119, 124 (2000) (citations omitted) ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion."); <u>United States v. Menendez</u>, No. 20-13628, 2022 WL 2388421, at *4 (11th Cir. July 1, 2022) (per curiam) (citations omitted) (officers "observed conduct giving rise to reasonable suspicion of criminal activity beyond the traffic infraction" where the driver and passenger "both exhibited extreme nervousness, even after being told that [the driver] would be given only a warning ticket"); <u>United States v. Simms</u>, 385 F.3d 1347, 1350, 1354-55 (11th Cir. 2004) (concluding that reasonable suspicion existed to prolong a traffic stop in part because the driver "continued to appear very nervous even after being told he was only getting a warning citation").  Foster kept looking around in different directions as Corporal Jones wrote the warning, which prompted him to ask if Foster was expecting someone and contributed to his suspicion that Foster may be engaged in unlawful activity.  (Tr. 2 at 61; F-Gov. Ex. 2 at 04:10-04:28).  While Corporal Jones testified that he intentionally put aside that he had been told that the agents who had conducted surveillance earlier in the day believed that narcotics were inside the BMW, (Tr. 2 at 82, 86), under the collective knowledge doctrine, it was objectively reasonable to extend the scope and duration of the stop to investigate whether narcotics were inside the vehicle,

United States v. Garcia, CRIMINAL ACTION NO. 1:20-cr-00188-LMM-RDC-1, 2021 WL 2652963, at *6 (N.D. Ga. June 10, 2021) (citation omitted) ("Consequently, the collective knowledge of all the law enforcement officers involved in the operation is considered in determining whether there was reasonable suspicion to extend a traffic stop."), adopted by 2021 WL 2651355, at *1 (N.D. Ga. June 28, 2021). Simply put, Corporal Jones' subjective intentions in conducting the stop are irrelevant because what matters is whether there was reasonable suspicion based on the collective knowledge of the law enforcement officers participating in the investigation to prolong the stop. See Harget, 458 F.3d at 1260; Craig v. Singletary, 127 F.3d 1030, 1042–43 (11th Cir. 1997). As previously discussed, contrary to Foster's contention, the evidence presented at the hearing supports application of the collective knowledge doctrine, and the collective knowledge of the agents provided reasonable suspicion to prolong the stop and investigation of whether Foster was transporting narcotics in the BMW. United States v. Armstrong, No. CR 315–001, 2015 WL 2452901, at *5-6 (S.D. Ga. May 21, 2015) (finding decision to initially hold defendant for six minutes after he was issued a traffic warning in order to conduct a free air sniff was reasonable at its inception based on the collective knowledge of all officers, which was imputable to the officer conducting

the traffic stop and that included information provided by confidential informants that the defendant was a drug courier), adopted at *1.

"[T]he length of the delay consumed in the conduct of the investigative detention must have been 'sufficiently limited in scope and duration to remain within the bounds' permitted by *Terry*." Simmons, 172 F.3d at 780 (quoting United States v. Hardy, 855 F.2d 753, 758 (11th Cir. 1988)). "Several issues and circumstances are relevant to this analysis, including 'the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention.'" Id. (quoting Hardy, 855 F.3d at 758); see also United States v. Hernandez, Criminal Case No. 1:12-CR-00322-AT-JFK, 2013 WL 7035606, at *7 (N.D. Ga. Aug. 12, 2013), adopted as modified by 2014 WL 111211, at *1 (N.D. Ga. Jan. 13, 2014), supplemented by, 17 F. Supp. 3d 1255 (N.D. Ga. 2014). As to the first factor, the law enforcement purpose served by prolonging the stop beyond the initial traffic offense was to confirm or dispel the reasonable suspicion that Foster may be transporting narcotics in his vehicle as he drove in the direction of the Jenkins Correctional Facility, where he was employed as a counselor, since the communications between Foster and Corea obtained through the wiretap

investigation indicated that she had met Foster to provide him narcotics that he would take inside the facility.  (Tr. 2 at 8-9, 15-16).

Corporal Jones pursued his investigation diligently as he conversed with Foster while writing him a warning citation, (Tr. 2 at 82-83; F-Gov. Ex. 2 at 02:58-04:12), and after noticing behavior that indicated to him based on his experience that Foster was "overly nervous" for someone receiving only a warning, (Tr. 2 at 61-62), Corporal Jones asked for permission to search the vehicle, (Tr. 2 at 63; F-Gov. Ex. 2 at 08:23-08:29).  Corporal Jones continued writing the warning as he talked with Foster, (Tr. 2 at 63-64; F-Gov. Ex. 2 at 08:30-09:32), and his asking of questions unrelated to the traffic stop "did not unreasonably prolong the traffic stop," United States v. Burrows, 564 F. App'x 486, 491 (11th Cir. 2014) (per curiam) (unpublished) (finding that questions unrelated to the traffic stop asked during the 12-minute duration before the dog alerted did not unreasonably prolong the stop); see also Johnson, 555 U.S. at 333 (citation omitted) ("An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquires do not measurably extend the duration of the stop."); United States v. Barker, 644 F. App'x 1000, 1002 (11th Cir. 2016) (per curiam) (unpublished) (citations omitted); United States v. Trevino, Criminal Case No. 1:13-CR-0324-01-SCJ, 2015 WL 859386,

27

at *8 (N.D. Ga. Feb. 27, 2015) (finding "questions posed to [d]efendant unrelated to the stop were not improper and did not prolong the stop"), adopted at *1.

When Foster declined to consent to a search of his vehicle, Corporal Jones immediately called for a K-9 unit, which arrived approximately one minute later, as Corporal Jones continued completing the warning citation.  (Tr. 2 at 63, 78-79; F-Gov. Ex. 2 at 08:23-09:32).  Approximately 11 minutes after Corporal Jones had initiated the stop, the K-9 alerted to an order of narcotics in the trunk of the vehicle, (Tr. 2 at 64, 79; F-Gov. Ex. 2 at 10:36-11:20), and "the intervening development of probable cause based upon the dog's alert" obviates the need to determine whether the continued detention of Foster to open the cylinder "would have been reasonable," Simmons, 172 F.3d at 781.  Nevertheless, Corporal Jones completed the warning citation and commenced searching the vehicle less than one minute after the alert, (F-Gov. Ex. 2 at 11:50-21:10), and he located the cylinders containing methamphetamine in the trunk approximately 21 minutes into the stop, (Tr. 2 at 65-66; F-Gov. Ex. 2 at 21:11-21:40).

Foster stood beside his vehicle, unrestrained and in public view at the gas station where he was stopped, conversing with Corporal Jones and singing aloud at times.  (Tr. 2 at 62; F-Gov. Ex. 2 at 01:11-08:29).  He remained unrestrained and stood beside Corporal Jones' patrol vehicle during the search of the BMW and

continued to converse with Corporal Jones, who asked him questions about various items he found in the vehicle during the search.  (F-Gov. Ex. 2 at 11:50-21:10).  Foster was restrained in handcuffs only after Corporal Jones cut open one of the cylinders and discovered the methamphetamine.  (Tr. 2 at 66-67; F-Gov. Ex. 2 at 21:11-21:40).

Finally, "[t]here is no rigid time limitation or bright line rule regarding the permissible duration of a *Terry* stop," United States v. Nuckles, Criminal Case No. 1:14-CR-218-ODE-AJB, 2015 WL 1600687, at *17 (N.D. Ga. Apr. 7, 2015) (citation and internal marks omitted), adopted at *9, aff'd, 649 F. App'x 834 (11th Cir. 2016) (per curiam) (unpublished), "but detentions of less than one hour have been repeatedly upheld as reasonable," id. (collecting cases).  Thus, the 21-minute duration of the stop in this case was reasonable.  Accordingly, the Court concludes that the purpose of the detention, Corporal Jones' diligence in completing the stop and promptly calling for the K-9 to confirm or dispel his reasonable suspicion of illegal activity, "the limited scope of the continued detention beyond that warranted for a 'normal traffic stop,' and the overall length of the total detention, all place [defendants'] detention well within the bounds permitted by *Terry v. Ohio* and its progeny." Simmons, 172 F.3d at 781.

### d. Probable Cause to Search the Vehicle

The Court finds that the warrantless search of Foster's vehicle was supported by probable cause to believe it contained contraband. "Under the automobile exception, agents may conduct a warrantless search of a vehicle if (1) the vehicle is readily mobile (i.e., operational); and (2) agents have probable cause to believe the vehicle contains contraband or evidence of a crime." United States v. Tamari, 454 F.3d 1259, 1261 (11th Cir. 2006). "The legality of a warrantless automobile search is based on the existence of probable cause to believe that the automobile is carrying contraband subject to forfeiture under the law, and the difficulties of securing a moveable vehicle while a warrant is obtained." United States v. Thomas, 536 F. Supp. 736, 742 (M.D. Ala. 1982); see also Chambers v. Maroney, 399 U.S. 42, 51-52 (1970); United States v. Alexander, 835 F.2d 1406, 1409 (11th Cir. 1988).

Probable cause to search exists "'when the facts and circumstances would lead a reasonably prudent [person] to believe that the vehicle contains contraband.'" Alexander, 835 F.2d at 1409 (alteration in original) (quoting United States v. Clark, 559 F.2d 420, 424 (5th Cir. 1977)).[6]   In determining whether

---

[6] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

probable cause exists, the Court "may examine the collective knowledge of the officers 'if they maintained at least a minimal level of communication during their investigation.'"   United States v. Olmedo, 552 F. Supp. 2d 1347, 1357 (S.D. Fla. 2008) (quoting Willis, 759 F.2d at 1494).   Thus, under the automobile exception, a warrantless search of a vehicle does not violate the Fourth Amendment 'if the vehicle is operational and 'under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found' in the vehicle." Tamari, 454 F.3d at 1262 (quoting United States v. Goddard, 312 F.3d 1360, 1363 (11th Cir. 2002)).

Foster argues that TFO Gray did not believe that the agents had probable cause to stop him after he left the meeting with Corea since he asked the Richmond County Sheriff's Office investigators to request that a uniformed patrol officer develop independent probable cause to make a traffic stop of his vehicle. See [Doc. 437 at 1, 6-7].   However, Foster's contention is not supported by the evidence as TFO Gray testified that, based on the wire intercepts and the activity observed in the transaction between Foster and Corea, agents believed that a drug transaction had occurred, but he requested that the Richmond County Sheriff's Office narcotics investigators ask a uniformed patrol officer to attempt to develop independent probable cause for a traffic stop to assist the investigation and

strengthen their case in order to protect the integrity of the active wiretap investigation so that it would not have to be disclosed if state charges were filed. (Tr. 2 at 17-18, 28).  Indeed, TFO Gray specifically testified on cross-examination that "based on the wire intercepts and based on [his] personal experience of having conducted probably over a 100 undercover drug transactions, it appeared to be a drug deal" between Corea and Foster, (Tr. 2 at 22), but "there are many times [agents] observe serious drug felonies being conducted and [they] don't take any action at that point in time other than conducting surveillance and documenting the surveillance and to assist in developing a stronger, larger investigation," (Tr. 2 at 24).  Moreover, it is irrelevant whether the agents believed they had probable cause to stop Foster as he departed the Harveys supermarket parking lot following the transaction with Corea because the agents' subjective beliefs are immaterial to the question of whether probable cause existed, see Devenpeck v. Alford , 543 U.S. 146, 153 (2004) (citations omitted) ("Our cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause. . . . . [H]is subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause."); Arango, 396 F. App'x at 632-33 (citation and internal marks omitted) ("Where objectively reasonable conditions permit a stop, the officer's motive in making the traffic stop

does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment."), and the evidence here establishes that the agents conducting surveillance had reasonable suspicion, at a minimum, to stop and search the BMW after observing the transaction between Foster and Corea that was consistent with the information received from the wire intercepts and the investigation indicating that Corea had met Foster to transfer narcotics to him to take into the Jenkins Correctional Facility, see United States v. Pineda, No. 1:06-cr-350-WSD, 2008 WL 686239, at *10-11 (N.D. Ga. Mar. 10, 2008) (finding collective knowledge of officers conducting wiretap surveillance of drug trafficking organization followed by the observations of defendant actually engaging in activity expressed during the intercepted calls gave officers sufficient probable cause to search vehicle), adopted at *4; United States v. Jackson, 548 F. Supp. 2d 1314, 1320-21 (M.D. Fla. 2008) (finding probable cause to search vehicle existed based on the information learned through the wiretap and earlier surveillance confirming information), adopted at 1317.  Moreover, prior to searching the BMW, Corporal Jones developed additional information following the lawful traffic stop of Foster that supplied probable cause to search the vehicle, including his observations of Foster's behavior during the stop and the positive alert by the K-9.  See Hernandez, 17 F. Supp. 3d at 1260 (citations omitted) (finding where "the

officers with knowledge of the investigation [], in effect directed [another officer], who was aware of a bare minimum information of the facts of the federal investigation, to conduct a traffic stop if feasible based on [the officer's] reasonable suspicion of [d]efendant's prostitution activity" were circumstances "sufficient to trigger the collective knowledge doctrine"); see also Olmedo, 552 F. Supp. 2d at 1357.  As previously discussed, the DEA HIDTA agents and Richmond County Sheriff's Office narcotics investigators "involved in this investigation maintained more than a minimal level of communication during the events on [August 30, 2018]," Olmedo, 552 F. Supp. 2d at 1357, and based upon the information from the wire room and their surveillance, they communicated to Corporal Jones that the BMW Foster was driving may contain narcotics, and he lawfully stopped the vehicle for a traffic offense and developed additional facts supporting probable cause to search the vehicle, and "[u]nder the totality of the circumstances, [Corporal Jones] had probable cause to search [Foster's vehicle] and to seize the [cylinders] located within the [vehicle]," United States v. Rodriguez-Alejandro, 664 F. Supp. 2d 1320, 1340 (N.D. Ga. 2009) (citations omitted).  Accordingly, it is **RECOMMENDED** that Foster's motion to suppress evidence, [Doc. 372], as perfected, [Doc. 381], be **DENIED**.

34

**B.**   **Gama-Aguirre's Motion to Suppress, [Docs. 344 & 348]**

Gama-Aguirre moves to suppress statements he made on February 3, 2021, when he was encountered and arrested during the execution of a search warrant at a residence, contending that the statements were not made voluntarily.  [Docs. 344 & 348].  Following the evidentiary hearing on his amended motion, Gama-Aguirre filed a supplemental brief, [Doc. 417], to which the government responded, [Doc. 419].  For the reasons that follow, it is **RECOMMENDED** that Gama-Aguirre's motion to suppress statements, [Doc. 344], as supplemented, [Doc. 348], be **DENIED**.

      **1.**   *Statement of Facts*

On February 3, 2021, between approximately 9:00 and 10:00 p.m., Homeland Security Investigations ("HSI") agents executed a search warrant at 928 North Hampton Drive, Norcross, Georgia, a residence occupied by co-defendant Elizabeth Reyes ("Reyes"), who had rented two storage units in which HSI agents found narcotics and a firearm during the execution of search warrants earlier that day.  (Tr. 1 at 5-6, 13-14, 21).  Between five and nine agents, who had their weapons drawn and were wearing ballistics vests that identified them as law enforcement officers, approached the residence, knocked on the door, and announced their presence in both English and Spanish.  (Tr. 1 at 6-7, 15-16).  When someone opened

the door of the residence, agents entered and secured the occupants in the living room and conducted a security sweep of the entire residence.  (Tr. 1 at 6, 16-17). Gama-Aguirre, who was one of the individuals in the residence, was patted down and placed in handcuffs and remained in the living room during the security sweep.  (Tr. 1 at 19).  The other adult occupant, Reyes, and two or three minor children also were placed in the living room.  (Tr. 1 at 17-18).

After the security sweep was completed, agents escorted Gama-Aguirre to the dining room where he was seated at a table with Task Force Officer Raul Perez ("TFO Perez") and Investigator Sheree Reynolds ("Investigator Reynolds").[7]  (Tr. 1 at 6-7, 22-23).  The agents determined that Gama-Aguirre spoke Spanish, so TFO Perez, who is a native Spanish speaker, translated between Investigator Reynolds and Gama-Aguirre.  (Tr. 1 at 4-5, 22-23).  Gama-Aguirre asked for a jacket because he was cold and one was provided to him.  (Tr. 1 at 7-8, 23).  Prior to conducting the interview, TFO Perez advised Gama-Aguirre of his <u>Miranda</u>[8] rights in Spanish. (Tr. 1 at 8).  TFO Perez read the rights advisement directly from a standard Spanish

---

[7] TFO Perez does not recall whether Gama-Aguirre was released from handcuffs or remained handcuffed in front during the interview.  (Tr. 1 at 6).

[8] <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

language HSI card.  (Tr. 1 at 8-9; G-Gov. Ex. 1).  The advisement was translated as follows:

> You have the right to remain silent.  Anything you say can and will be used against you in a court of law.  You have the right to consult with a lawyer before questioning and have your lawyer present during questioning and have your lawyer present during the questioning.  If you cannot pay for a lawyer, one will be provided to you free of cost to represent you before you answer any questions.  Do you understand you rights?

(Tr. 1 at 9; G-Gov. Ex. 1).  After reading the last statement, TFO Perez asked, "Knowing your rights, are you willing to relinquish your rights and speak to me?" (Tr. 1 at 9-10).  TFO Perez made eye contact with Gama-Aguirre, who nodded in the affirmative.  (Tr. 1 at 10).  When asked again, Gama-Aguirre said, "'Yes, I would like to talk to you because I want to know why you are here.'"  (Id.).

According to TFO Perez, Gama-Aguirre answered questions appropriately and was "very coherent."  (Tr. 1 at 11).[9]  Gama-Aguirre did not seek clarification regarding his rights, did not request an attorney, and at no point asked to stop the interview.  (Id.).  Gama-Aguirre was interviewed while the search of the residence was being conducted by other agents, (Tr. 1 at 25), and the interview lasted approximately 30 minutes, (Tr. 1 at 28).  Near the end of the interview, Gama-

---

[9] The interview was audio recorded, (Tr. 1 at 8, 26-27), but the recording was not offered as an exhibit at the evidentiary hearing.

Aguirre asked for medicine, which was provided to him.  (Tr. 1 at 8, 23, 27-28).  At the conclusion of the interview, Gama-Aguirre reported that he felt ill, and he was transported to the hospital.  (Tr. 1 at 28).  Gama-Aguirre was arrested on an outstanding warrant.  (Tr. 1 at 20).

### 2. *Discussion*

Gama-Aguirre moves to suppress the statements he made on February 3, 2021, contending that his statements were not voluntary because they "were made in the context of an inherently coercive environment," in that his "will was overborne under the totality of the circumstances, including his immediate detention, the swarming presence of law enforcement officers and his separation from the minor children in[ ]the residence."  [Doc. 417 at 6].  Statements made in response to custodial interrogation are admissible only if the defendant was informed of his <u>Miranda</u> rights and waived them.  In <u>Miranda</u>, the Supreme Court acknowledged that custodial interrogations, by their very nature, create "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."  384 U.S. at 467.  Therefore, to address this inherent compulsion and protect a suspect's Fifth Amendment privilege against self-incrimination, <u>Miranda</u> established certain procedures law enforcement must follow.  Specifically, prior to the initiation of

custodial questioning, law enforcement agents must fully advise the suspect of the government's intention to use his statements to secure a conviction and must inform him of his rights to remain silent and to "have counsel present . . . if he so desires." Id. at 468-70.

It is undisputed that Gama-Aguirre was advised of his Miranda rights in his native language and that he waived his rights and spoke with the agents, but the government bears the burden of proving by a preponderance of evidence that Gama-Aguirre validly waived his Miranda rights. United States v. Chirinos, 112 F.3d 1089, 1102 (11th Cir. 1997) (citation omitted); see also Colorado v. Connelly, 479 U.S. 157, 168-69 (1986) (citations omitted). A defendant may waive his rights under Miranda if the waiver is made knowingly, intelligently, and voluntarily. Miranda, 384 U.S. at 444, 475. This inquiry has two distinct dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

United States v. Patterson, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *3 (N.D. Ga. Aug. 10, 2007) (quoting United States v. Barbour, 70 F.3d 580, 585

(11th Cir. 1995)), adopted at *1; see also Moran v. Burbine, 475 U.S. 412, 421 (1986) (citations omitted); Edwards v. Arizona, 451 U.S. 477, 482 (1981) (citations omitted); Fare v. Michael C., 442 U.S. 707, 725 (1979); Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). "No single factor is necessarily determinative of the issue whether a defendant knowingly and intelligently waived his rights but the court must engage in a fact-specific inquiry based on all of the circumstances." Patterson, 2007 WL 2331080, at *3 (citation omitted). However, an express oral or written waiver of Miranda is strong proof of the validity of the waiver. United States v. Stephens, 202 F. Supp. 2d 1361, 1370 (N.D. Ga. 2002) (citation omitted).

To find a waiver involuntary, "coercive police activity is a necessary predicate." Connelly, 479 U.S. at 167. And, whether a suspect intelligently waived his rights depends on the particular circumstances in a case, including the background, experience, and conduct of the defendant; the defendant's age; familiarity with the criminal justice system; and his demeanor and conduct during the interrogation. See Edwards, 451 U.S. at 482 (citations omitted); Coleman v. Singletary, 30 F.3d 1420, 1426-27 (11th Cir. 1994). However, "[a] criminal suspect is not required to know and understand every possible consequence of a waiver for it to be knowingly and intelligently made[;] it is enough if he understands that he may choose not to speak to law enforcement, speak only with counsel present,

and to stop speaking at any time." United States v. Reilly, CR416-353-003, 2017 WL 3833859, at *2 (S.D. Ga. Aug. 4, 2017) (second alteration in original) (citation and internal marks omitted), adopted by 2017 WL 3726723, at *1 (S.D. Ga. Aug. 29, 2017).

Here, there is no evidence in the record of any unlawful coercion of Gama-Aguirre during his interview. See generally (Tr. 1). The interview, which occurred in the dining room of the residence, was conducted in his native language, with TFO Perez translating, as Gama-Aguirre remained seated at the table free from any physical force or threats, and the agents never displayed their firearms, which remained holstered after the initial entry and protective sweep of the residence. See (Tr. 1 at 6-11). Moreover, Gama-Aguirre, is an adult, who appeared to understand what the agents discussed with him and answered the agents' questions in a coherent manner. (Tr. 1 at 11). Gama-Aguirre did not ask to stop the interview or refuse to answer questions, nor did he otherwise indicate that he did not understand his rights or the consequences of his waiver. (Tr. 1 at 10-11). Accordingly, the totality of the circumstances demonstrate that Gama-Aguirre voluntarily, knowingly, and intelligently waived his rights. See United States v. Vanbrackle, 397 F. App'x 557, 562-63 (11th Cir. 2010) (per curiam) (unpublished) (finding defendant voluntarily, knowingly, and intelligently waived his Miranda

rights, despite the presence of eight law enforcement officers during the execution of a search warrant, some of whom had their firearms drawn upon entry in defendant's residence, but not during the interview, since the officers did not threaten defendant, who had a college education, to induce him to speak, nor was the defendant handcuffed during the interview, which took place in his home after he had been advised of his rights and the nature of the investigation and signed a waiver); see also United States v. Pichardo, 659 F. App'x 603, 605 (11th Cir. 2016) (per curiam) (unpublished) (affirming district court's ruling that defendant knowingly and voluntarily waived his Miranda rights where record showed that he was arrested at his home while his children were present, he had time to review the "waiver form that explained his rights in detail," there was no evidence that he was coerced into waiving his rights, and he was not handcuffed when he reviewed and signed the form).

Although Gama-Aguirre's statements were not taken in violation of Miranda, "the [C]ourt still must determine that any confessions or incriminatory statements made by [Gama-Aguirre] were voluntary in order to admit them at trial." United States v. Lazarus, 552 F. App'x 892, 895 (11th Cir. 2014) (per curiam) (unpublished) (citing United States v. Bernal–Benitez, 594 F.3d 1303, 1317–18 (11th Cir. 2010)). Whether a statement was voluntarily given must be examined in light

of the totality of the circumstances.  United States v. Shepherd, Criminal Case No.

1:11–cr–00058–ODE–RGV–1, 2011 WL 4443440, at *7 (N.D. Ga. Aug. 23, 2011)

(citing Schneckloth, 412 U.S. at 226; Hubbard v. Haley, 317 F.3d 1245, 1252 (11th

Cir. 2003)), adopted by 2011 WL 4443435, at *1 (N.D. Ga. Sept. 21, 2011).  "This

totality of the circumstances test directs the Court ultimately to determine whether

a defendant's statement was the product of 'an essentially free and unconstrained

choice.'"  United States v. Villaverde-Leyva, Criminal Action File No. 1:10-CR-035-

RWS/AJB, 2010 WL 5579825, at *11 (N.D. Ga. Dec. 9, 2010) (citation omitted),

adopted by 2011 WL 121932, at *1 (N.D. Ga. Jan. 14, 2011).  "Among the factors the

Court must consider are the defendant's intelligence, the length of his detention,

the nature of the interrogation, the use of any physical force against him, or the

use of any promises or inducements by police."  Id. (citations omitted).

The focus of the voluntariness inquiry is whether Gama-Aguirre was

coerced by the government into making the statements, so "the relinquishment of

the right must have been voluntary in the sense that it was the product of a free

and deliberate choice rather than intimidation, coercion, or deception."  Moran,

475 U.S. at 421; see also United States v. Cordova, 829 F. Supp. 2d 1342, 1353 (N.D.

Ga. 2011) (citation omitted), adopted at 1345.  Thus, "[t]hose cases where courts

have found confessions to be involuntary 'have contained a substantial element of

coercive police conduct.'" <u>Patterson</u>, 2007 WL 2331080, at *4 (quoting <u>Connelly</u>, 479 U.S. at 164).  "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession."  <u>United States v. Jones</u>, 32 F.3d 1512, 1517 (11th Cir. 1994) (per curiam) (citation and internal marks omitted); <u>see also</u> <u>Martin v. Wainwright</u>, 770 F.2d 918, 926 (11th Cir. 1985), <u>modified in unrelated part by</u>, 781 F.2d 185 (11th Cir. 1986) (per curiam) (alteration in original) (citation and internal marks omitted) (noting that the test for determining voluntariness of a confession and whether coercion was present is whether the defendant's "will [was] overborne and his capacity for self-determination critically impaired").

After being advised of his rights, Gama-Aguirre waived his rights and proceeded to speak with the agents, and the evidence before the Court indicates that he was not threatened and understood his rights and the questions being asked of him and responded appropriately in a coherent manner and free from any indication that he felt under duress.  (Tr. 1 at 6-11).  Nothing in the record calls into question Gama-Aguirre's ability to have understood his situation and the agents' questions, as TFO Perez's testimony establishes that Gama-Aguirre provided responsive answers during the interview, indicating he understood the

44

questions being asked of him, and that despite understanding the situation, he never indicated that he wished to stop the interview or that he did not want to answer a question. (Tr. 1 at 11). Indeed, the record before the Court demonstrates that Gama-Aguirre "remained coherent and capable of understanding what was being said to him, and he provided relevant responses," United States v. Martin, No. 1:14–CR–00427–ELR, 2015 WL 4664889, at *14 (N.D. Ga. Aug. 6, 2015) (citation omitted), adopted at *5, and while he requested a jacket and medicine during the interview, which were provided to him, (Tr. 1 at 7-8, 23, 27-28), he never requested an attorney or asked to stop the interview, (Tr. 1 at 11).

On these facts, the government has shown that, under the totality of the circumstances, Gama-Aguirre's statements "were voluntary and the product of a free and deliberate choice, made in the absence of intimidation, coercion, and deception." United States v. Hill, No. CR 114–028, 2014 WL 5410214, at *11 (S.D. Ga. Oct. 23, 2014), adopted at *1. In short, "[t]here is no credible evidence that [Gama-Aguirre] believed he was in physical danger or had no choice but to cooperate with the [agents]," and he was not "subjected to an exhaustively long interrogation, physical force, or abusive language," as the interview lasted only approximately 30 minutes. Id. at *11-12. In fact, Gama-Aguirre "does not accuse the [agents] of acting in any way to threaten, coerce, deceive, or injure him," but

merely alleges, in essence, "that he was scared and intimidated by the agents [who made entry into the home]," but "[i]t is beyond peradventure . . . that the mere execution of warrant by law enforcement officers is a woefully inadequate basis for suppression in the absence of any threats, use of force, improper inducements, deception, or any other conduct by law enforcement agents to coerce." Id. at *12; see also United States v. Lynn, 547 F. Supp. 2d 1307, 1308, 1310 (S.D. Ga. 2008) (citation omitted) (finding defendant's statements were voluntary where although "defendant was clearly shaken by the intrusion into his home" by the agents' use of a battering ram to force the door open to execute a warrant, "there [was] no evidence of record that he believed that he was in physical danger or that he had no choice but to cooperate with the agents" and "even if [he] had harbored such a subjective belief, his state of mind [was] immaterial without some indication of police misconduct"), adopted at 1308.  "Considering the totality of the circumstances as established by the evidence adduced at the evidentiary hearing, the Court finds that the government has demonstrated by a preponderance of the evidence that [Gama-Aguirre's] statements were entirely voluntary." Lynn, 547 F. Supp. 2d at 1311 (citation omitted).  Thus, it is **RECOMMENDED** that Gama-Aguirre's motion to suppress statements, [Doc. 344], as supplemented, [Doc. 348], be **DENIED**.

C.      **Conclusion**

For the foregoing reasons and cited authority, it is **RECOMMENDED** that

Gama-Aguirre's motion to suppress statements, [Doc. 344], as supplemented,

[Doc. 348], and Foster's motion to suppress evidence, [Doc. 372], as perfected,

[Doc. 381], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the

undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and

the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 27th day of July, 2022.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

47